## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| N99, LLC | |
| Plaintiff, | C.A. No. |
| vs. | JURY TRIAL DEMANDED |
| SONIFI SOLUTIONS, INC., | |
| Defendant. | |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff N99, LLC ("N99") complains against Sonifi Solutions, Inc. ("Sonifi") as follows:

### THE PARTIES

1.      Plaintiff N99 is a Massachusetts limited liability company having a principal place of business at 272 Amity Street, Amherst, Massachusetts 01002.

2.      Defendant Sonifi is a Delaware corporation having a principal place of business at 3900 W. Innovation Street, Sioux Falls, South Dakota 57107.

### JURISDICTION AND VENUE

3.      This action arises under the patent laws of the United States, *e.g.*, 35 U.S.C. §§ 271, 281, 283-285. Subject matter jurisdiction exists under 28 U.S.C. §§ 1331 and 1338(a).

4.      Defendant Sonifi conducts significant business in the State of Delaware, and in this judicial district, and it is incorporated in this State. Additionally, Sonifi's registered agent may be found at Corporation Trust Center 1209 Orange St., Wilmington, DE 19801. Accordingly, this Court has personal jurisdiction over Sonifi, and venue is proper in this Court under 28 U.S.C. § 1391 and/or § 1400.

## FACTUAL BACKGROUND

### N99 and the N99 Patents

5.      N99 is owned and operated by Dr. Steven Gold. Dr. Gold is a medical doctor by degree and the prolific inventor of over twenty issued U.S. patents.

6.      Dr. Gold attended medical school to pursue his dream of inventing medical device technologies. His first two issued patents covered medical device technologies, and subsequent issued patents include those relating to the sensing of physiologic information using mobile devices, as well as the use of mobile devices for mapping applications and as remote controls.

7.      Following medical school, Dr. Gold became a successful entrepreneur and started companies in the life sciences, software development, and other fields. Dr. Gold has also taught entrepreneurship at the college level and helped to establish entrepreneurship programs globally.

8.      Dr. Gold formed N99 in 2011 in order to research, develop and commercialize new ideas and inventions, including Dr. Gold's proximity-enabled remote control technologies.

9.      Under Dr. Gold's leadership, N99 obtained several issued patents related to proximity-enabled remote-control technologies with one additional patent application pending (collectively referred to as the "N99 Patents"): U.S. Patent No. 8,655,345 (the "'345 Patent") was filed January 9, 2012, issued February 18, 2014, and is included herewith as Exhibit A; U.S. Patent No. 9,787,756 (the "'756 Patent") was filed June 12, 2015, issued October 10, 2017, and is included herewith as Exhibit B; U.S. Patent No. 9,942,304 (the "'304 Patent") was filed September 20, 2017, issued April 10, 2018, and is included herewith as Exhibit C; U.S. Patent No. 10,778,747 (the "'747 Patent") was filed June 10, 2019, issued September 15, 2020, and is included herewith as Exhibit D; U.S. Patent No. 11,265,364 (the "'364 Patent") was filed August 31, 2020, issued March 1, 2022, and is included herewith as Exhibit E; U.S. Patent No. 11,665,224 (the "'224 Patent") was filed

January 5, 2022, issued May 30, 2023, and is included herewith as Exhibit F; and U.S. Patent Application No. 18/137,034 (the "'034 Application") is currently pending examination.

10.    N99 has standing to sue for infringement of the N99 Patents.

### The Patented Methods, the State of the Art, and Patent Eligible Subject Matter.

11.    The N99 Patents describe several challenges with using conventional remote-control technologies, including but not limited to "1) the difficulties posed to a user to synchronize or otherwise set up a remote control so that it will communicate with a particular object that the user desires to control, 2) the need for a user to have multiple different remote controls for multiple different objects that a user desires to control, 3) difficulties updating remote control user interfaces, if even possible, and 4) a general lack of real-time feedback to the user relating to the object being remotely controlled." '224 Patent at 1:22-31.

12.    The N99 Patents identified "a need for improved methods, devices and systems that allow a user to use a mobile device, such as a common smart phone or similar electronic communication device, to readily 'synchronize' the mobile device with one or more remotely controllable objects, and to enable the presentation and use of one or more relevant remote control user interfaces so that a user can efficiently and effectively remotely control one or more remotely controllable objects, possibly including real-time feedback." *Id.* at 1:31-40.

13.    Specifically, the combination of enabling remote control of an object through a remote server, based on a determination of physical proximity and unique device identifiers, and providing feedback at a user interface, was not well-understood, routine, or conventional at the time of the invention of the N99 Patents.

14.    The N99 Patents discuss a number of benefits offered by the invention over conventional remote control technology, which include:

- "enabl[ing] a user to access relevant remote control user interfaces . . . on a mobile device, for one or more objects that the user desires to control—all by means of a NFC initiated physical approximation of the user's mobile device and an object-associated NFC element;"
- "enabl[ing] mobile device users to remotely control objects by means of wireless communication with a remote server, rather than directly (meaning direct communication between a device and an object, such as would be the case with a current television remote control);"
- "allow[ing] a mobile device user to possess and use different remote control user interfaces for each of many different objects, providing remote control user interfaces that are most relevant to each target object;"
- providing user authentication "in any of a variety of ways that are not possible using conventional remote controls," such as giving "different users control [of the] same object;" and
- "enabling [users] to use a personal mobile device (rather than one or more other devices) to control one or more remotely controllable objects using remote control user interfaces that are specific and relevant to each object."

*Id.* at 20:50-21:28.

<strong>Sonifi's Infringing Products</strong>

15.     Sonifi offers four products that, alone or in combination, infringe upon the N99 Patents: Sonifi's stayconnect, STAYCAST, SORA, and Sonifi Health products ("the Infringing Products").

16.     Sonifi's stayconnect product is an application that users can download on their smartphones or laptops, for example on the iOS App Store or on Google Play, which allows users to pair their phones with their hotel room televisions in order to use their phones as a remote control for the television.

17.     With stayconnect, users "at thousands of hotels across North America" can use their phones to "[p]ower the TV on and off," "[c]ontrol and mute the volume of the TV," and "[c]hange channels and browse the TV lineup with the included channel list." *See* https://play.google.com/store/apps/details?id=com.sonifi.stayconnect; https://apps.apple.com/us/app/stayconnect-remote/id6443801825.

18.     Not including hotel-specific apps using the same program, the stayconnect app has over 100,000 downloads on the Google Play store alone.

19.     Sonifi's SORA product is a "next-generation interactive platform for hospitality" that "operates on and supports multiple in-room hardware options, including Google Chromecast, set-top-boxes and smart TVs," as described in a press release dated June 24, 2019, and accessible at https://www.sonifi.com/sonifi-introduces-sora/. A 2020 webinar that was previously accessible on Sonifi's website at https://info.sonifi.com/sora-the-next-generation-interactive-platform-for-hospitality explained that Sonifi was developing a Mobile TV Controls API feature for SORA that would enable customers to integrate TV control capability into their own app.

20.     Sonifi's STAYCAST product enables users to connect their mobile devices with a particular television in their hotel rooms, so that the user can stream content from their phones to the television via Chromecast. *See* https://www.sonifi.com/streaming/. Sonifi Health also uses STAYCAST for their entertainment options in hospitals, allowing guests to also control TVs there. *See* https://www.sonifihealth.com/entertainment/.

21.     STAYCAST allows guests access to over 2,000 apps and has been deployed in over 350,000 rooms across 21 countries. *See* https://www.sonifi.com/streaming/; https://www.sonifihealth.com/staycast/.

22.     Sonifi Health includes a "Mobile/BYOD" feature that allows patients, among other things, to connect to the TV in their room and control it from their phone or a hospital tablet. Sonifi Health also gives patients the ability to cast apps onto the TV using STAYCAST. *See* https://www.sonifihealth.com/mobile-byod/.

### N99's Discussion with Sonifi and Development of the '224 Patent

23.     Sonifi has been aware of the N99 Patents since at least October 15, 2019, when N99 first sent Sonifi a letter disclosing the N99 Patents and offering the patents for sale or license.

24.     Discussions ensued and on September 15, 2020, Sonifi sent an email identifying remote printing over wi-fi as a potentially invalidating prior art to claim 1 of the '823 Patent, without identifying any particular patent or specific prior art reference.

25.     On May 22, 2022, Sonifi identified U.S. Patent No. 8,412,839, and on August 19, 2022, U.S. Patent No. 7,325,057 as potentially invalidating prior art.

26.     Accordingly, Dr. Gold filed an IDS with the United States Patent and Trademark Office ("USPTO") during prosecution of U.S. Patent Application No. 17/569,401, listing a 2009 Brother Software User's Guide covering remote printing over wi-fi and U.S. Patent Nos. 8,412,839 and 7,325,057.

27.     The examiner at the USPTO issued the 17/569,401 application as the '224 Patent over these alleged prior art references.

## COUNT I – DIRECT PATENT INFRINGEMENT

28.     Sonifi's customers (and Sonifi, through product testing and development, among other things) directly infringed the N99 Patents when using the Infringing Products on mobile devices like phones and laptops.

### Infringement of the '224 Patent by stayconnect

29.     N99 incorporates Paragraphs 1–28 of this Complaint as though fully set forth herein.

30.     By way of example, at least Claim 1 of the '224 Patent is infringed by stayconnect. Claim 1 of the '224 Patent covers a method, which can be carried out through, among other things, the use of the Sonifi's stayconnect application loaded onto an iOS device.

31.     The preamble of claim 1 requires: "A method performed by at least one computer processor executing computer program instructions stored on at least one non-transitory computer-readable medium to perform a method, the method comprising."

32.     The Sonifi stayconnect application comprises a method performed by a computer processor executing computer program instructions. Those instructions are stored on at least one non-transitory computer-readable medium—a non-transitory television in a hotel room, for example.

33.     The first step of claim 1 requires: "(a) at a first mobile device, at a first time, receiving a first communication, wherein the first communication comprises information representing an identity of a first remotely controllable object."

34.     The user of the stayconnect application connects their mobile device to a television—the remotely controllable object—whereupon the mobile device receives a numeric code input by the user representing an identity of the television.



35.     The next step of claim 1 requires: "(b) at the first mobile device, in response to receiving the first communication, wirelessly transmitting a second communication, to a remote server, wherein the second communication comprises the information representing the identity of the first remotely controllable object, wherein the first remotely controllable object and the first mobile device are physically distinct from each other, and wherein the first remotely controllable object and the remote server are physically distinct from one another."

36.     The mobile phone with the application downloaded on it, in response to receiving the numeric code, then wirelessly transmits that code to a Chromecast device—a remote server. The television, the mobile device, and the Chromecast device are all physically distinct from one another.



37.     The next step of claim 1 requires: "(c) at the first mobile device, at a second time after the first time, presenting a first remote control user interface, wherein the first remote control user interface comprises a volume control element to control a volume at the first remotely controllable object."

38.     After the user's mobile device is connected, the mobile device presents the user with an interface that remotely controls the television. The user interface includes the ability to change volume on the television.



39.     The next step of claim 1 requires: "(d) at the first mobile device, at a third time after the second time, receiving a first input that indicates a first action to be performed at the first remotely controllable object, using the volume control element, wherein the first action comprises at least one of changing a volume and selecting a volume at the first remotely controllable object."

40.     The user subsequently can perform a touch gesture on the user interface of the mobile device to change or select the volume on the television. Alternatively, the user can press the speaker icon in the middle of the screen to mute the television.

41.     The next step of claim 1 requires: "(e) at the first mobile device, in response to receiving the first input that indicates the first action to be performed at the first remotely controllable object, wirelessly transmitting a third communication, to the remote server, the third communication comprising information based on the first input."

42.     When the user performs a touch gesture on the user interface of the mobile device to change the volume, the mobile device wirelessly transmits a command to change the volume to the Chromecast.

43.     The final step of claim 1 requires: "(f) at the first mobile device, after receiving the first input that indicates the first action to be performed at the first remotely controllable object, presenting first feedback relating to the first input at the first remote control user interface."

44.     When the user performs a touch gesture on the user interface of the mobile device to change the volume, the mobile device provides feedback by changing the background color of a portion of the interface, the location of the speaker icon, and the length of the thin blue line to indicate the volume level.

45.     As a direct and proximate consequence of the infringement, N99 has been, is being, and will continue to be injured in its business and property rights unless such acts and practices are enjoined by the Court, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

46.     Sonifi's direct infringement of the '224 Patent has been willful because Sonifi has known of the '224 Patent and its infringement, yet has nonetheless injured N99.

### Infringement of the '224 Patent by STAYCAST

47.     N99 incorporates Paragraphs 1–28 of this Complaint as though fully set forth herein.

48.     By way of example, at least Claim 1 of the '224 Patent is infringed by STAYCAST. Claim 1 of the '224 Patent covers a method, which can be carried out through, among other things, the use of the Sonifi's STAYCAST product on a user's mobile device.

49.     Sonifi's STAYCAST works in a similar manner to the stayconnect application, except that users connect via the internet, rather than a downloadable app.

50.     The preamble of claim 1 requires: "A method performed by at least one computer processor executing computer program instructions stored on at least one non-transitory computer-readable medium to perform a method, the method comprising."

51.     STAYCAST comprises of a method performed by a computer processor executing computer program instructions. Those instructions are stored on at least one non-transitory computer-readable medium—a non-transitory television in a hotel room, for example.

52.     The first step of claim 1 requires: "(a) at a first mobile device, at a first time, receiving a first communication, wherein the first communication comprises information representing an identity of a first remotely controllable object."

53.     The STAYCAST user first connects their phone or laptop to the hotel's wi-fi network. The television displays a code—a first communication—that the user then inputs into a website on their mobile device.



https://www.youtube.com/watch?v=i6UUQW5Qbdg (1:06/3:07)

54.     The next step of claim 1 requires: "(b) at the first mobile device, in response to receiving the first communication, wirelessly transmitting a second communication, to a remote server, wherein the second communication comprises the information representing the identity of the first remotely controllable object, wherein the first remotely controllable object and the first

mobile device are physically distinct from each other, and wherein the first remotely controllable object and the remote server are physically distinct from one another."

55.     The mobile phone or laptop, in response to receiving the numeric code, then wirelessly transmits that code to a Chromecast device—a remote server. The television, the mobile device, and the Chromecast device are all physically distinct from one another.



https://www.youtube.com/watch?v=i6UUQW5Qbdg (1:12/3:07)

56.     The next step of claim 1 requires: "(c) at the first mobile device, at a second time after the first time, presenting a first remote control user interface, wherein the first remote control user interface comprises a volume control element to control a volume at the first remotely controllable object."

57.     After the user's mobile device is connected, the mobile device presents the user with an interface that remotely controls the television. The user interface includes the ability to change volume on the television.



https://www.androidpolice.com/2020/11/13/how-to-control-chromecast-with-google-tv-volume-using-your-phone/

58.     The next step of claim 1 requires: "(d) at the first mobile device, at a third time after the second time, receiving a first input that indicates a first action to be performed at the first remotely controllable object, using the volume control element, wherein the first action comprises at least one of changing a volume and selecting a volume at the first remotely controllable object."

59.     The user subsequently can perform a touch gesture on the user interface of the mobile device to change to a specific volume on the television.

60.     The next step of claim 1 requires: "(e) at the first mobile device, in response to receiving the first input that indicates the first action to be performed at the first remotely controllable object, wirelessly transmitting a third communication, to the remote server, the third communication comprising information based on the first input."

61.     When the user performs a touch gesture on the user interface of the mobile device to change the volume, the mobile device then wirelessly transmits the command to change the volume to the Chromecast.

62.     The final step of claim 1 requires "(f) at the first mobile device, after receiving the first input that indicates the first action to be performed at the first remotely controllable object, presenting first feedback relating to the first input at the first remote control user interface."

63.     When the user performs a touch gesture on the user interface of the mobile device to change the volume, the mobile device presents feedback by changing the size of the gray bar and the location of the gray dot to indicate the volume level.

64.     As a direct and proximate consequence of the infringement, N99 has been, is being, and will continue to be injured in its business and property rights unless such acts and practices are enjoined by the Court, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

65.     Sonifi's direct infringement of the '224 Patent has been willful because Sonifi has known of the '224 Patent and its infringement, yet has nonetheless injured N99.

### Infringement of the '364 Patent by stayconnect

66.     N99 incorporates paragraphs 1-28 of this Complaint as though fully set forth herein. Sonifi's customers (and Sonifi, through product testing and development, among other things) infringed and continue to infringe at least claim 1 of the '364 Patent through use of Sonifi's stayconnect app.

67.     By way of example, Claim 1 covers a method, which can be carried out through, among other things, the use of the Sonifi's stayconnect application loaded onto a mobile device, such as an iPhone.

68.    The preamble of claim 1 provides: "A method performed by at least one computer processor executing computer program instructions stored on at least one non-transitory computer-readable medium to perform a method, the method comprising."

69.    Sonifi's stayconnect app provides an interactive entertainment platform for controlling a television in a hotel room, for example, which is a method performed by a computer processor executing computer program instructions. The instructions are stored on a user's mobile device, such as an iPhone, which is a non-transitory computer-readable medium.

70.    The next step of claim 1 requires: "(a) at a first mobile device, at a first time, receiving a first communication, wherein the first communication comprises information representing an identity of a first remotely controllable object."

71.    When a user of the stayconnect app connects their mobile device to a television, a remotely controllable object, the mobile device receives a numeric code input by the user representing an identity of the television.



72.    The next step of claim 1 requires: "(b) at the first mobile device, in response to receiving the first communication, wirelessly transmitting a second communication, to a remote

server, wherein the second communication comprises the information representing the identity of the first remotely controllable object, wherein the first remotely controllable object and the first mobile device are physically distinct from each other, and wherein the first remotely controllable object and the remote server are physically distinct from one another."

73.     In response to receiving the numeric code, the mobile phone with the stayconnect app wirelessly transmits that code to a Chromecast device, a remote server. The television, the mobile device, and the Chromecast device are all physically distinct from one another.



74.     The next step of claim 1 requires: "(c) at the first mobile device, at a second time after the first time, presenting a first remote control user interface, wherein the first remote control user interface comprises a channel control element to control a channel at the first remotely controllable object."

75.     After the user's mobile device is connected, the mobile device presents the user with an interface that remotely controls the television. The user interface includes the ability to change channels on the television.



76.    The next step of claim 1 requires: "(d) at the first mobile device, at a third time after the second time, receiving a first input that indicates a first action to be performed at the first remotely controllable object, using the channel control element, wherein the first action comprises at least one of changing a channel and selecting a channel at the first remotely controllable object."

77.    The user subsequently performs a touch gesture on the user interface of the mobile device to change to a specific channel on the television.

78.    The next step of claim 1 requires: "(e) at the first mobile device, in response to receiving the first input that indicates the first action to be performed at the first remotely controllable object, wirelessly transmitting a third communication, to the remote server, the third communication comprising information based on the first input."

79.    When the user performs a touch gesture on the user interface of the mobile device to change channels, the mobile device wirelessly transmits a command to change channels to the Chromecast.

80.     The final step of claim 1 requires "(f) at the first mobile device, after receiving the first input that indicates the first action to be performed at the first remotely controllable object, presenting first feedback relating to the first input at the first remote control user interface."

81.      When the user performs a touch gesture on the user interface of the mobile device to change channels, the mobile device presents feedback by changing the background color of the channel on the mobile device to gray and displaying a spinning icon to indicate the channel change is in progress.

82.     As a direct and proximate consequence of the infringement, N99 has been, is being, and will continue to be injured in its business and property rights unless such acts and practices are enjoined by the Court, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

83.     Sonifi's direct infringement of the '364 Patent has been willful because Sonifi has known of the '364 Patent and its infringement, yet has nonetheless injured N99.

### Infringement of the '224 and '364 Patents by Sonifi Health

84.     N99 incorporates Paragraphs 1–83 of this Complaint as though fully set forth herein.

85.     Sonifi Health includes features that works in a similar manner to the stayconnect and STAYCAST products.



# Patient mobile – bring your own device

Education, iTV controls, room automations, web portals and more are all accessible via an easy-to-navigate mobile app.

Enable patients the ability to use their personally owned mobile devices to access hospital services and interactive features of the SONIFI Health interactive TV solution.



https://www.sonifihealth.com/mobile-byod/

19

86. Because Sonifi Health has the same infringing features of stayconnect and STAYCAST embedded—including, specifically, the pairing method and TV control options, Sonifi Health infringes the '224 and '364 Patents for the same reasons described above.

87. As a direct and proximate consequence of the infringement, N99 has been, is being, and will continue to be injured in its business and property rights unless such acts and practices are enjoined by the Court, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

88. Sonifi's direct infringement of the '364 and '224 Patents has been willful because Sonifi has known of the '364 and '224 Patents and its infringement, yet has nonetheless injured N99.

## COUNT II – INDUCEMENT OF DIRECT PATENT INFRINGEMENT

89. N99 incorporates Paragraphs 1–88 of this Complaint as though fully set forth herein.

90. Sonifi has infringed the N99 Patents indirectly through acts of inducement.

91. In addition to Sonifi's direct infringement, Sonifi's customers—who used the Infringing Products—also directly infringed the N99 Patents. Sonifi knew of the N99 Patents at least as early as October 15, 2019, the date that the first letter to Sonifi was marked with. However, Sonifi continued to instruct and encourage its customers on how to use the Infringing Products in an infringing manner after being advised of the N99 Patents, being provided detailed claim charts, and being aware of the infringement of the N99 Patents.

92. The following screenshot was taken from Sonifi's official YouTube channel, in one of many almost identically scripted videos explaining how to use STAYCAST.



https://www.youtube.com/watch?v=i6UUQW5Qbdg (1:06/3:07)

93.     Below is a screenshot, taken on the 24th of August, 2023, of Sonifi's YouTube page, where Sonifi instructs its customers on how to use various Sonifi products, including stayconnect, SORA, and STAYCAST:



https://www.youtube.com/@sonifisolutionsinc.4690/videos

94.     Below is a screenshot taken of a customer explaining to over ten thousand viewers how to use stayconnect to control a hotel television from a phone.  This shows the consumer infringement that Sonifi intends and markets their products for.



https://www.youtube.com/watch?v=t53_7lpoPQQ

95.    Sonifi knowingly and intentionally actively aided, abetted, and induced others to infringe (such as their customers, users, and/or business partners in this judicial district and throughout the United States). Sonifi induced infringement by supplying the Infringing Products, knowing that these customer acts constituted infringement, and induced that infringement by instructing and encouraging its use in the manner described above.

23



https://www.youtube.com/@rpstechnologiesllc785/videos

96.     Sonifi has provided the Infringing Products, knowing of the N99 Patents and with the specific intent that their customers infringe the N99 Patents.

97.     Sonifi has also continued to aggressively market the Infringing Products to at least hospitals and hotels, knowing of the N99 Patents and with the specific intent that their customers infringe the N99 Patents.

Whether it's for a handful of rooms or a system-wide PX standard, STAYCAST is a scalable streaming solution for your organization now & in the future

FACILITY & ORGANIZATION BENEFITS

## A reliable solution for healthcare settings

STAYCAST can be deployed in weeks with minimal resources needed from your staff

LIMITED IN-ROOM HARDWARE

+ Chromecast device (wired or wireless) is compatible with all major TV brands

+ Familiar tech is compatible with both iOS and Android systems

+ Logins are never entered onto the TV or hospital system



SIMPLE & SECURE STREAMING

SONIFI SUPPORT & PATENTED TECHNOLOGY

+ Network isolation ensures patient privacy & device security

+ Automatic disconnections at transfer or discharge

+ 24/7 technical assistance & proactive remote monitoring

https://www.sonifihealth.com/staycast/

# Where you can find our technology

With more than a million hospitality rooms under management, SONIFI technology is deployed in hospitality properties of every size and chain scale.

+ **Global** brands & franchises

+ **Independent & boutique** hotels

+ **Casino & gaming** hotels

+ **Resorts & convention** centers

https://www.sonifi.com/technology/

98.     Sonifi's indirect infringement by inducement has injured N99. N99, therefore, is entitled to recover damages adequate to compensate it for such infringement, but in no event less than a reasonable royalty.

99.     Sonifi's indirect infringement by inducement has been willful because Sonifi has known of the N99 Patents and its infringement, yet has nonetheless injured N99.

100.    As a direct and proximate consequence of the infringement, N99 has been, is being, and will continue to be injured in its business and property rights unless such acts and practices are enjoined by the Court, and has suffered, is suffering, and will continue to suffer injury and damages for which it is entitled to relief under 35 U.S.C. § 284 adequate to compensate for such infringement, but in no event less than a reasonable royalty.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff N99 asks this Court to enter judgment against Sonifi and against its respective subsidiaries, affiliates, agents, servants, employees, and all persons in active concert or participation with them, granting the following relief:

A.     An award of damages adequate to compensate N99 for the infringement that has occurred, together with prejudgment and post-judgment interest from the date infringement of the respective N99 PERC Portfolio began, attorneys' fees, and statutory costs;

B.     An award to N99 of all remedies available under 35 U.S.C. § 284;

C.     An award to N99 of all remedies available under 35 U.S.C. § 285;

D.     A permanent injunction prohibiting further infringement, inducement and contributory infringement of the N99 Patents by the Infringing Products; and,

E.     Such other and further relief as this Court or a jury may deem proper and just.

## JURY DEMAND

N99 demands a trial by jury on all issues so triable.

Dated: October 6, 2023

OF COUNSEL:

William W. Flachsbart
Robert P. Greenspoon
Mark A. Magas
DUNLAP, BENNETT & LUDWIG
333 N. Michigan Avenue, Suite 2700
Chicago, IL  60601
T:  312-551-9500
F:  312-551-9501

Respectufully submitted,

FARNAN LLP

*/s/ Michael J. Farnan*
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 North Market St.
12th Floor
Wilmington, DE 19801
Tel: 302-777-0300
Fax: 320-777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Counsel for Plaintiff N99, LLC*